IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**TASER International, Inc.,**

        Plaintiff,

v.

        Civil Action No. 11-426-RGA

**Karbon Arms, LLC,**

        Defendant.

MEMORANDUM OPINION

Kelly E. Farnan, Esq. (argued), Richards, Layton & Finger, Wilmington, DE; Chad M. Shandler, Esq., Richards, Layton & Finger, Wilmington, DE; Jason J. Rawnsley, Esq., Richards, Layton & Finger, Wilmington, DE, attorneys for Plaintiff.

Pilar G. Kraman, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; John P. Moy, Esq. (argued), Smith, Gambrell & Russell, LLP, Washington, DC, attorneys for Defendant.

December 19, 2013

ANDREWS, U.S. District Judge:

Presently before the Court are motions for summary judgment submitted by Plaintiff TASER International, Inc. (D.I. 132) and related briefing (D.I. 133, 139, 162), and by Defendant Karbon Arms, LLC (D.I. 130) and related briefing (D.I. 131, 137, 163). The Court has heard helpful oral argument on both motions. (D.I. 171).

## I.      BACKGROUND

This is a patent infringement action. Plaintiff TASER International, Inc. ("TASER") alleges that Defendant Karbon Arms, LLC ("Karbon" or "Karbon Arms") infringes U.S. Patent No. 6,999,295 ("the '295 patent"), U.S. Patent No. 7,782,592 ("the '592 patent"), and U.S. Patent No. 7,800,885 ("the '885 patent"). (D.I. 5, 28). Currently, TASER is asserting claim 2 of the '295 patent, claims 1, 9-11, and 40-41 of the '592 patent, and claims 7-10, 12, 15, and 18-37 of the '885 patent. (D.I. 131-5 Ex. D). Karbon alleges that the pending claims are invalid. (D.I. 8).

## II.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The

1

burden on the moving party may be discharged by pointing out to the district court that there is
an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue
for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986);
*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving
party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to
particular parts of materials in the record, including depositions, documents, electronically stored
information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or
other materials; or (B) showing that the materials cited [by the opposing party] do not establish
the absence ... of a genuine dispute ...." FED. R. CIV. P. 56(c)(1).[1]

When determining whether a genuine issue of material fact exists, the court must view
the evidence in the light most favorable to the nonmoving party and draw all reasonable
inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476
F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable
jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49; *see
Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 ("Where the record taken as a whole could not
lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for
trial.'"). If the non-moving party fails to make a sufficient showing on an essential element of its
case with respect to which it has the burden of proof, the moving party is entitled to judgment as
a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

---

[1] There is an extensive record in this case. To the extent a party does not properly oppose factual
assertions, the Court considers the factual assertion to be undisputed and a basis on which to
grant summary judgment. FED. R. CIV. P. 56(e)(2) & (3).

2

## III.   DISCUSSION

There are numerous infringement and non-infringement arguments contained in the briefs. They can be broken down into the following. First, TASER asserts that the Karbon Arms MPID infringes the '295 and '592 patents. (D.I. 133 at 5-7). Karbon replies that these claims cannot be infringed because the MPID is a single mode device. (D.I. 139 at 2). Second, TASER asserts that the Karbon Arms MPID infringes the '885 patent. (D.I. 133 at 8-12). Karbon replies that TASER cannot prove infringement because TASER has not met its evidentiary burden. (D.I. 139 at 9). Third, TASER asserts that Karbon is estopped from challenging the validity of the '295 patent because Stinger, a predecessor of Karbon Arms, agreed to a stipulated judgment of infringement which included a finding that claim 2 of the '295 patent is valid and enforceable. (D.I. 133 at 14). Lastly, TASER asserts that Karbon Arms has failed to make a *prima facie* case of obviousness because the Frus reference is not analogous art. (D.I. 133 at 15).

### A.   Whether the Karbon MPID Infringes Claim 2 of the '295 Patent and Claims 1, 9-11, and 40-41 of the '592 Patent is a Question for the Jury.

Karbon has two primary arguments in support of its non-infringement position. The first is that the Karbon MPID is a single mode device, and therefore cannot infringe. (D.I. 131 at 5-9). The second argument is that TASER is estopped from asserting that flyback pulses, such as those used by the Karbon MPID, can constitute two different modes. (D.I. 131 at 9-12).

Before delving into the merits of these arguments, a bit of background is in order. TASER and Karbon both manufacture electronic control devices ("ECDs"), which are designed to incapacitate a subject for a period of time by delivering a sequence of high voltage pulses in order to stun the subject or cause involuntary muscle contractions. ECDs deliver current through electrodes on the weapon or through darts fired from the weapon that remain tethered via wire. A

3

common problem that projectile ECDs encounter is that most subjects wear clothing. When the darts strike the subject, they may lodge in the subject's clothing, which creates an air gap in the electrical circuit created by the darts and the subject's skin. Because air is not a good conductor, a very high voltage is required to bridge the air gap.

When the air gap is bridged by the initial application of current, the air itself becomes ionized. Because ionized air, also referred to as plasma, is a much better conductor than air, current can flow across the gap at a reduced voltage. This phenomenon of voltage drop after ionization is referred to as flyback. The problem with air gaps and the associated ionization and flyback is that high voltages are necessary to ionize the air gap, but such high voltages are unnecessary, and indeed a waste of limited power during subsequent application of current.

In order to overcome this problem, the '295 patent discloses generating a first high voltage in order to ionize the air gap and subsequently generating a second lower voltage to maintain the current flow. (3:35-45 of '295). A preferred embodiment accomplishes this by using two capacitors, one of which is connected to a voltage multiplier. (Fig. 2 of '295). During flyback operation, the first capacitor, which is connected to the voltage multiplier, discharges the high voltage output, which ionizes the air gap. Subsequently, the device switches to the second capacitor, which directly connects to the electrodes. (6:5-15 of '295). This second type of operation is referred to as direct drive.

In the previous litigation between TASER and Stinger, Karbon's predecessor, the device at issue operated in both flyback and direct drive manners. (D.I. 131 at 7). The Arizona Court held that flyback and direct drive constituted separate modes so as to infringe claim 2 of the '295 patent. *Taser Int'l, Inc. v. Stinger Sys., Inc.*, 705 F. Supp. 2d 1115, 1156-58 (D. Ariz. 2010).

4

Because the Karbon MPID operates only in flyback configuration, Karbon argues that it cannot

infringe the '295 and '592 patents because it is not a dual mode device. (D.I. 131 at 5).

The independent claims at issue are claim 2 of the '295 patent and claims 1 and 40 of the

'592 patent. Claim 2 of the '295 patent and claim 1 of the '592 patent both require:

> a power supply for operating in a first mode to generate a first high voltage, short
> duration output across the first and second electrodes during a first time interval
> to ionize the air within the air gap to thereby reduce the high impedance across
> the air gap to a lower impedance to enable current flow across the air gap at a
> lower voltage level and for subsequently operating in a second mode to generate a
> second lower voltage output across the first and second electrodes during a second
> time interval to maintain the current flow across the first and second electrodes...

(Claim 2 of '295).[1] Claim 40 of the '592 patent is a method claim, which requires:

> sourcing, for a first period, electricity to ionize air in a gap at the target thereby
> starting a current through the target; reducing an output voltage magnitude
> capability of the source; and after the first period and after reducing, sourcing
> electricity for a second period longer than the first period, to continue the current
> through the target...

(Claim 40 of '592). Karbon attempts to equate the terms "mode" and "period" by citing to the

deposition testimony of TASER's expert, Mr. Loud. (D.I. 131 at 6). In his deposition, Mr. Loud

testified that there is no difference between the first mode of circuit operation and the first

ionizing period. (D.I. 131-5 Ex. E at 49:17-51:3). However, this does not mean that the claims

themselves are interchangeable. Mr. Loud's testimony must be taken in context of the subject

matter, namely the Karbon MPID. When referring to the "mode" and "period" as being

interchangeable, the implication is that the operation of the Karbon MPID which would allegedly

infringe the "mode" limitation is the same operation that would allegedly infringe the "period"

limitation. Mr. Loud's testimony is not an admission that "mode" and "period" are equivalents,

---

[1] Claim 1 of the '592 patent uses almost identical language.

just that the Karbon MPID's behavior may infringe on both limitations concurrently. Just because a device might infringe more than one claim does not mean that the claims themselves are interchangeable, just that there is some overlap in scope.

Similarly, the fact that "mode" applied to a certain operation in the previous litigation does not mean that it precludes applying the term to a different operation in the current litigation. In the Arizona litigation, the infringing device operated in flyback and direct drive manners. There is no dispute that flyback and direct drive constitute two different modes. There is also no dispute that the Karbon MPID operates only in flyback mode. However, this does not mean that the flyback mode of the Karbon MPID only constitutes one "mode," as claimed in the '295 and '592 patents. In flyback operation, the Karbon MPID fires a series of short pulses, followed by a series of longer pulses. TASER has opined that the shorter duration pulses are the first mode and the longer duration pulses constitute the second mode. (D.I. 133 at 6). The patents do not preclude differences in pulse frequency from constituting separate modes, nor do they preclude a finding that flyback operation constitutes two modes.

Karbon also argues that TASER's infringement position is barred by the doctrine of argument based estoppel due to statements that TASER made to the USPTO during the reexamination of the '295 patent. (D.I. 131 at 9). Karbon asserts that estoppel should apply to the '592 patent as well, because arguments made during reexamination proceedings can serve to limit claim scope of the patent being reissued, and therefore estoppel should apply to the entire patent family. (D.I. 163 at 5). In response, TASER argues that estoppel should have been brought up during claim construction, that TASER's statements do not rise to the level of estoppel, that

6

prosecution history estoppel does not affect direct infringement, and that any estoppel does not apply to the '592 patent. (D.I. 137 at 5).

On November 29, 2010 an *ex parte* reexamination request of the '295 patent was filed with the USPTO. (D.I. 131-5 Ex. H). Claims 2-5 and 40 were initially rejected in view of U.S. Patent No. 4,120,305 issued to Kevin George Rhoads and George Michael Plotkin (hereinafter "Rhoads" or the "Rhoads patent"). (D.I. 131-5 Ex. I). In response, TASER made several arguments, which Karbon contends constitute a disclaimer of claim scope that would include the current infringement contentions.

During reexamination, the Examiner rejected the claims under 35 U.S.C. § 102(b) over Rhoads, asserting that Rhoads anticipated the claims. (D.I. 131-5 Ex. I at 3). In response, TASER pointed out all of the ways in which Rhoads did not teach the elements of the claims, including that Rhoads does not teach an air gap (D.I. 131-5 Ex. J at 4) and that Rhoads does not teach ionizing the air gap (D.I. 131-5 Ex. J at 6). Additionally, TASER traversed the Examiner's interpretation of the term "mode," which forms the basis of Karbon's argument. (D.I. 131-5 Ex. J at 15-17). Indeed, TASER opposed the position that "any two different voltages of an output waveform indicate two different modes of operation" and that "any two output frequencies in an output waveform indicate two different modes of operation." (D.I. 131-5 Ex. J at 17).

While at first glance Karbon's estoppel argument seems strong, there are numerous hurdles which Karbon fails to overcome. First, while Karbon argues that it has shown argument based prosecution history estoppel, that type of estoppel only applies to infringement under the doctrine of equivalents. *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008). TASER has not claimed that the Karbon MPID infringes under the doctrine of

7

equivalents, only that the Karbon MPID literally infringes, so this type of estoppel does not apply. Second, while there is another type of estoppel known as prosecution disclaimer, which does apply to literal infringement, it is too late to raise that now. Prosecution disclaimer acts by limiting claim scope, something which should have been brought up during claim construction. *See Cordis*, 511 F.3d at 1177 (prosecution disclaimer limits claim scope); *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005) (affirming district court's refusal to consider untimely claim construction arguments). Third, both argument based prosecution history estoppel and prosecution disclaimer require a clear and unmistakable disavowal. *Cordis*, 511 F.3d at 1177. TASER's arguments during reexamination do not rise to the level of a clear and unmistakable surrender as is required for a finding of estoppel or disclaimer.

"There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term." *SanDisk*, 415 F.3d at 1287. There are two separate statements that Karbon relies upon in its argument. The first is the statement that "the voltages identified by the Examiner are produced by operation in one and the same mode of operation – the fly back mode." (D.I. 131-5 Ex. J at 15). However, solely because flyback operation only constituted one mode in the Rhoads patent does not mean that flyback operation must always constitute one mode. This statement was clearly in response to the rejection over Rhoads, and must be taken in context. TASER went on to explain that "[t]wo modes of operation are not necessarily present when a damped sinusoid waveform is output." *Id.* at 16. As support, TASER quoted the Arizona Court, which stated, "[t]he claimed invention is not merely a low voltage output, but a distinct

8

manner of circuit operation which generates the low voltage output more efficiently…" *Id.* at 17. Rhoads clearly taught only one manner of circuit operation, the flyback operation.

The second statement which Karbon relies upon is TASER's traversal of the Examiner's position that any two different voltages of an output waveform indicate two different modes of operation and that any two output frequencies in an output waveform indicate two different modes of operation. There is very little in the record to shed light on these statements. What is clear is that during an interview, the Examiner held these positions and that TASER traversed them. (D.I. 131-5 Ex. J at 17). Without more, there cannot be a clear and unmistakable disclaimer of claim scope.[2,3]

For the reasons above, Karbon's motion for summary judgment of noninfringement of the '295 and '592 patents is denied. TASER has moved for summary judgment of infringement of claim 2 of the '295 patent and claims 1 and 40 of the '592 patent. However, there appear to be a factual dispute as to whether the Karbon MPID generates a second lower voltage or whether any lower voltage is the natural result of ionization of the air gap. Therefore, TASER's motion is denied.

**B. Karbon Arms Infringes Claim 18 of the '885 Patent.**

---

[2] The Examiner confirmed the patentability of the claims because Rhoads does not teach ionization of an air gap, not due to any of the "mode" arguments cited by Karbon. (Notice of Intent to Issue a Reexam Certificate 5/2/2011 at 3). While not dispositive, the Federal Circuit has stated that, "[a]lthough actual reliance by the examiner need not be shown, if an estoppel is to rest upon argument made during examination process, the circumstances must be such as to permit the inference that such reliance in fact occurred." *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1425 n.8 (Fed. Cir. 1994). Here there can be no inference of reliance.

[3] Karbon also argued that any estoppel should apply to the '592 patent as well. Even if TASER were estopped with regard to the '295 patent, there would be no basis for applying estoppel based on arguments made during the reexamination of a different patent, which occurred after the '592 patent issued.

TASER has moved for a finding that Karbon infringes Claim 18 of the '885 patent. (D.I.

133 at 8-13). Karbon naturally opposes this motion and moves for a finding of non-infringement

of claims 7-10, 12, 15, and 18-37 of the '885 patent, of which claims 7, 8, 9, 12, 15, 18, and 28

are independent claims. (D.I. 131 at 12-17). The claims can be separated into two groups based

on the specific language used. Claims 7, 8, 9, 12, and 15 include the limitation:

> the effective duration of any one compliance signal of the group does not overlap
> in time the effective duration of any other compliance signal of the group.

Claims 18 and 28 each include the limitations:

> except for the initial compliance signal group of the series, each next compliance
> signal group of the series is automatically separated in time from a respective
> immediately prior compliance signal group of the series;

> except for the initial compliance signal of a particular compliance signal group of
> the series, each next compliance signal of the particular compliance signal group
> is automatically separated in time from a respective immediately prior compliance
> signal.

Karbon's non-infringement argument rests solely on an alleged deficiency of TASER's

testing method. (D.I. 139 at 10). Mr. Loud, TASER's expert, measured the output of the Karbon

MPID by using a 550 Ohm single resistor. (D.I. 139 at 10). Karbon asserts that in order to

properly measure the output, and therefore determine if the Karbon MPID infringes, Mr. Loud

should have used a resistor-capacitor ("RC") network, because a proposed industry standard calls

for such an RC network. (D.I. 139 at 10). Karbon's attorneys argue that the use of an RC network

introduces a time constant such that compliance signals would be overlapping. (D.I. 139 at 11).

As an initial matter, the two groups of claims cannot be dealt with together. An "effective

duration of any one compliance signal" not overlapping with another "effective duration" is not

the same as a "compliance signal ...separated in time from" another "compliance signal." A

"compliance signal" and the "effective duration of a compliance signal" are distinct terms that

cannot be used interchangeably. The patent explains that, "[w]hen the compliance signal causes pain and/or contraction of a skeletal muscle, the duration of the pain and/or contraction may define a period of time referred to as an effective duration of a compliance signal." (20:12-15 of '885). It is clear then that the compliance signal refers to the output of the device whereas the "effective duration" of the compliance signal refers to the effect of the output on the intended target. This is consistent with the Court's previous construction of "compliance signal" as "outputting of electricity intended for pain compliance or interference with muscle control." (D.I. 82 at 3).

Therefore, in order to prove infringement of claim 18 of the '885 patent, TASER must show that the individual compliance signals as well as the compliance groups are separated in time from the previous signal or group. Whether the effect of the output of the signal on the intended target is also non-overlapping is irrelevant to claim 18. Indeed, the draft standard that Karbon relies on discloses a test that employs a simple resistor "to allow the unfiltered waveform to be recorded." (D.I. 139-3 Ex. L at KADE058055). As TASER used a simple resistor to measure the compliance signals of the MPID, and found that they do not overlap, no disputed fact exists, and therefore Karbon infringes claim 18 of the '885 patent.[4]

As for the claims which require that the effective duration of compliance signals not overlap, TASER has met its burden to proceed past summary judgment. Mr. Loud testified that a resistance level of 500 ohms was consistent with his own experience in shock investigations. (D.I. 131-5 Ex. E at 77:10-17). Furthermore, the patent itself states that, "[a]n effective duration

---

[4] TASER did not move for a finding of infringement of claim 28 of the '885 patent, which uses the same language as claim 18. However, there is sufficient evidence that a jury could find infringement. Therefore Karbon's motion for summary judgment of non-infringement of that claim is denied.

may be defined with reference to a waveform of a compliance signal into a model of the tissue of a standard target...The inventors have found that a resistance (RB) of about 400 ohms is a suitable model..." (20:15-20 of '885). At the very least, there exists a factual dispute regarding which test method, the simple resistor or the RC network, is appropriate. Therefore, Karbon's motion for summary judgment of non-infringement of claims 7, 8, 9, 12, and 15 of the '885 patent is denied.

**C. Karbon Arms is Not Estopped From Challenging the Validity of the '295 Patent.**

TASER argues that Karbon Arms is estopped from attempting to invalidate claim 2 of the '295 patent due to issue preclusion, which may also be referred to as collateral estoppel. (D.I. 133 at 13). In order to be precluded on an issue, it must be shown that "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action. *" Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006). In the Arizona Litigation, Stinger, the predecessor of Karbon Arms, moved for partial summary judgment that claim 2 of the '295 patent was invalid. *TASER Int'l, Inc. v. Stinger Systems, Inc.*, 705 F. Supp. 2d 1115, 1126-28, 1132-35 (D. Ariz. 2010). Stinger's various anticipation and obviousness arguments were denied, some outright and some because of underlying factual disputes. *Id.* Following the denial of summary judgment, TASER and Stinger entered into a stipulated final judgment that Stinger infringed claims 2 and 40 of the '295 patent and that the claims were valid and enforceable. (D.I. 135-4 at 1-6, 9-12).

12

Due to the denial of summary judgment and the stipulated final judgment, TASER argues that Karbon meets the first, second, and third prongs of the issue preclusion analysis.[5] (D.I. 133 at 13-14). However, while TASER treats the issue of validity as one issue, each theory of invalidity is a separate issue:

> [I]f different theories of invalidity are presented in [a] second suit, or if the invalidity theories are based on different claim constructions or different prior art, the requirement of identicality is not satisfied. The same arguments are not being presented in the second suit. Further, given that when a district court finds that an accused infringer has failed to prove the invalidity of an asserted claim the court is not making a finding that the patent is valid for all time, but only that the accused infringer has failed to prove the patent invalid on the specific grounds it asserted[.]

6 Annotated Patent Digest § 38:46. Because the grounds on which Karbon now asserts invalidity are different from those asserted by Stinger in the Arizona litigation, the issue is not identical, and therefore Karbon is not estopped from challenging the validity of the '295 patent.

Implicit in TASER's argument is another type of issue preclusion, which arises solely from the prior stipulated judgment. Generally, "[w]here a judgment between parties is entered by consent prior to trial on any issue, no issue may be said to have been fully, fairly or actually litigated." *Foster v. Hallco Mfg. Co., Inc.*, 947 F.2d 469, 480 (Fed. Cir. 1991). However, courts have recognized that issue preclusion may attach in connection with consent judgments, whether or not the issue was actually litigated. *Id.* This type of preclusion arises not as a result from the four prong test, "but from an agreement manifesting an intention to be bound." *Id.* However, "provisions in a consent judgment asserted to preclude litigation of the issue of validity in connection with a new claim must be construed narrowly." *Id.* at 481.

---

[5] Karbon does not dispute that the fourth prong is met. (D.I. 139 at 13-17).

The language of the stipulated judgment in the Arizona litigation is not sufficient to demonstrate a clear intent to be bound. In *Foster*, the consent decree at issue stated that the patents "are valid and enforceable in all respects" and that the consent decree "is binding upon and constitutes res judicata between the parties." *Id.* The Federal Circuit held that:

> [T]he language of the decree is ambiguous with respect to barring the defense of invalidity with respect to different devices charged to be infringements. Except for the few words that Hallco points to which may not be boiler plate, nothing appears in the decree to which issue preclusion arguably could be tied. The clauses are slender reeds in themselves on which to rest its position that the parties intended to preclude particular issues—namely validity and enforceability—in future litigation of a different claim.

*Id.* at 482. The stipulated judgment in the Arizona litigation stated that "[c]laims 2 and 40 of the '295 patent are hereby adjudged to be valid and enforceable." (D.I. 135-4 at 34). This statement, which is the equivalent of the one in *Foster*, does not evidence clear intent to preclude subsequent litigation of the validity of the '295 patent.

## D. TASER Has Failed to Establish That the Frus Reference is Not Analogous Art as a Matter of Law.

TASER asserts that U.S. Patent No. 6,484,707 ("Frus") cannot be used as prior art for obviousness purposes because it is not analogous art, and therefore would not be available to the person of ordinary skill. (D.I. 133 at 16). In order to determine whether prior art is analogous, one asks: "(1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010) (internal citations omitted). "A reference is reasonably pertinent if it, as a result of its subject matter, logically would have commended itself to an inventor's attention in considering his problem." *K-TEC,*

14

*Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1375 (Fed. Cir. 2012) (internal citations omitted). Furthermore, "[w]hether a reference in the prior art is 'analogous' is a fact question." *Id.* The Frus reference is titled "Method and Apparatus for Generating a Sustained Arc at a Sparking Device" and deals generally with ignition systems.

In support of its argument, TASER points out that both the PTO and the District of Arizona considered stun guns and electronic ignition systems as different fields of endeavor. (D.I. 133 at 16-19). Furthermore, TASER cites to its expert for the proposition that Frus is not reasonably pertinent to the problems the inventors of the '295 and '592 patents were trying to solve. (D.I. 133 at 19-20). Karbon does not dispute that stun guns and ignition systems are different fields of endeavor, but points to the Frus reference itself for support that it is reasonably pertinent to the problem at hand. (D.I. 139 at 17-20). Karbon, as TASER points out, does not cite expert testimony in support of the assertion that the Frus reference is reasonably pertinent. (D.I. 162 at 9-10).

In order for TASER to establish as a matter of law that the Frus reference is not analogous art, the Court would need to find that no reasonable jury would consider Frus pertinent to the problems the inventors of the '295 and '592 patents were trying to solve. TASER has not met this high burden. The statements in the PTO and the District of Arizona were directed at references not currently at issue. (D.I. 133 at 17-19). There is no dispute that ignition systems and stun guns are different fields of endeavor. Just because a particular reference in a field is not reasonably pertinent to a problem has no bearing on whether another reference in that field is pertinent to that same problem.

15

TASER also argues that because Karbon Arms did not cite expert testimony showing that

Frus is analogous art, TASER is entitled to a finding in its favor. (D.I. 162 at 10). In support of

this, TASER cites to *INVISTA N. Am. S.à.r.l. v. M&G USA Corp.*, 2013 WL 3196817, at \*18 (D.

Del. June 25, 2013), where the court granted a motion for partial summary judgment of validity

because the defendant's obviousness argument was unsupported by expert testimony. While a

failure to cite to rebuttal testimony would generally be a failure to support a factual position

under Fed. R. Civ. P. 56(c)(1), Karbon's expert report is in the record (D.I. 135-5 Ex. T), and may

be considered under Fed. R. Civ. P. 56(c)(3).

Dr. DiEuliis, Karbon's expert, opined that:

> It is clear that Frus is directed towards the same problems as the patents-in-suit,
> namely to produce a high voltage pulse sufficient to ionize an air gap and then
> continue to supply energy (viz., voltage and current) to the ionized gap in an
> efficient manner... A person of ordinary skill in the art appreciates the similarity
> of the problem faced by Frus with the problem faced by the inventors of the
> patents-in-suit.

(D.I. 135-5 Ex. T at 108). While Dr. DiEuliis might not have directly responded to TASER's

expert's arguments, clearly there is a difference of opinion whether Frus is analogous art.

Because there is a factual dispute, summary judgment on this issue is inappropriate.

## IV. CONCLUSION

For the reasons above, Defendant's Motion for Summary Judgment of Noninfringement

(D.I. 130) is denied. Plaintiff's Motion for Partial Summary Judgment of Infringement of the

'295, '592 and '885 Patents and for No Invalidity of the '295 and '592 Patents (D.I. 132) is

granted in part and denied in part. An appropriate order will be entered.

16